1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   ALITA ANGELL-MURRAY AS                    No.  2:12-cv-2604-KJN
     GUARDIAN AD LITEM FOR E.A.-M.,
12
                  Plaintiff,
13                                             ORDER
           v.
14
     COMMISSIONER OF SOCIAL
15   SECURITY,

16                Defendant.

17

18         Plaintiff E.A.-M., by and through her mother and guardian ad litem Alita Angell-Murray,

19   (hereafter, "plaintiff") seeks judicial review of a final decision of the Commissioner of Social

20   Security ("Commissioner") denying plaintiff's application for Supplemental Security Income

21   ("SSI") under Title XVI of the Social Security Act ("Act").[1]  In her motion for summary

22   judgment, plaintiff principally contends that the Commissioner erred by finding that plaintiff was

23   not disabled from February 3, 2009, the date that plaintiff's application was filed.  (ECF No. 15.)

24   The Commissioner filed an opposition to plaintiff's motion and a cross-motion for summary

25   judgment.  (ECF No. 16.)

26   _____

27   [1] This action was initially referred to the undersigned pursuant to E.D. Cal. L.R. 302(c)(15), and
     both parties voluntarily consented to proceed before a United States Magistrate Judge for all
28   purposes.  (ECF Nos. 8, 11.)

                                                     1

For the reasons that follow, the court denies plaintiff's motion for summary judgment, grants the Commissioner's cross-motion for summary judgment, and enters judgment for the Commissioner.

I.      BACKGROUND

Plaintiff was born in October 2008 and was an infant on February 3, 2009, when her mother applied for SSI on plaintiff's behalf, primarily based on congenital heart problems.[2] (Administrative Transcript ("AT") 18, 89.)  On May 11, 2009, the Commissioner determined that plaintiff was not disabled.  (AT 15, 51.)  Upon plaintiff's request for reconsideration, the determination was affirmed on February 11, 2010.  (AT 15, 52.)  Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which took place on December 8, 2010, and at which plaintiff's mother testified.  (AT 15, 33-50.)

In a decision dated June 20, 2011, the ALJ determined that plaintiff had not been under a disability, as defined in the Act, since February 3, 2009, the date that plaintiff's SSI application was filed.  (AT 15-28.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 22, 2012.  (AT 1-5.)  Thereafter, plaintiff filed this action in federal district court on October 19, 2012, to obtain judicial review of the Commissioner's final decision.  (ECF No. 1.)

II.     ISSUES PRESENTED

Plaintiff has raised the following issues: (1) whether the ALJ erroneously found that plaintiff's impairments did not meet Listings 104.02C and 100.02B; and (2) whether the ALJ failed to appropriately develop the record.[3]

III.    LEGAL STANDARDS

General Standard of Review

The court reviews the Commissioner's decision to determine whether (1) it is based on

---

[2] Because the parties are familiar with the factual background of this case, including plaintiff's medical history, the court does not exhaustively relate those facts in this order.  The facts related to plaintiff's impairments and treatment will be addressed insofar as they are relevant to the issues presented by the parties' respective motions.

[3] Plaintiff's brief raises these issues in a different order.

1   proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record

2   as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial

3   evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340

4   F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable

5   mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d 625, 630 (9th

6   Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is

7   responsible for determining credibility, resolving conflicts in medical testimony, and resolving

8   ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citation omitted).  "The

9   court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational

10  interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

11                      Sequential Evaluation for Childhood Disability Claims

12          An individual under the age of 18 is considered disabled if she "has a medically

13  determinable physical or mental impairment, which results in marked and severe functional

14  limitations, and which can be expected to result in death or which has lasted or can be expected to

15  last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).  The

16  regulations prescribe a three-step sequential evaluation process to determine whether a child's

17  impairment or combination of impairments results in marked and severe functional limitations:

18  (1)     Is the child engaged in substantial gainful activity?  If so, the child is not disabled,

19  regardless of his medical condition, age, education, or work experience.  If not, the analysis

20  proceeds to step two.  20 C.F.R. § 416.924(a), (b).

21  (2)     Does the child have a medically determinable impairment or combination of impairments

22  that is severe, i.e., that causes more than minimal functional limitations?  If not, the child is not

23  disabled.  If so, the analysis proceeds to step three.  20 C.F.R. § 416.924(a), (c).

24  (3)     Does the child's impairment or combination of impairments meet, medically equal, or

25  functionally equal a listing?  If not, the child is not disabled.  If so, and the duration requirement

26  is satisfied, the child is disabled.  20 C.F.R. § 416.924(a), (d).

27          To meet or medically equal a listing, the child's impairment(s) must meet or medically

28  equal a set of criteria for the particular impairment as outlined in the Listings, 20 C.F.R. Part 404,

1  Subpart P, App. 1.  See 20 C.F.R. § 416.924(d); Sullivan v. Zebley, 493 U.S. 521, 530 (1990)

2  ("For a claimant to show that his impairment matches a listing, it must meet all of the specified

3  medical criteria").

4       To determine whether a child's impairment(s) functionally equals a listing, the ALJ must

5  assess the functional limitations caused by the child's impairment(s) in six domains: (i) acquiring

6  and using information; (ii) attending and completing tasks; (iii) interacting and relating with

7  others; (iv) moving about and manipulating objects; (v) caring for yourself; and (vi) health and

8  physical well-being.  20 C.F.R. § 416.926a(a), (b)(1).  A child's impairment(s) functionally

9  equals a listing when it is of listing-level severity, i.e., if it results in "marked" limitations

10 (limitations that interfere seriously with the child's ability to independently initiate, sustain, or

11 complete activities) in at least two domains of functioning, or "extreme" limitations (limitations

12 that interfere very seriously with the child's ability to independently initiate, sustain, or complete

13 activities) in at least one domain of functioning.  20 C.F.R. § 416.926a(a), (e).

14 IV.    DISCUSSION

15       A.    Summary of the ALJ's Findings

16       The ALJ evaluated plaintiff's entitlement to SSI pursuant to the above-mentioned three-

17 step analytical framework.  At the first step, the ALJ found that plaintiff had not engaged in

18 substantial gainful activity since February 3, 2009, plaintiff's SSI application date.  (AT 18.)  At

19 step two, the ALJ determined that plaintiff had the following severe impairments: right

20 ventricular hypertrophy and hypertension.  (Id.)  However, at the third step, the ALJ found that

21 plaintiff did not have an impairment or combination of impairments that meets or medically

22 equals a listed impairment.  (Id.)  Additionally, the ALJ determined that plaintiff did not have an

23 impairment or combination of impairments that functionally equals a listing.  (AT 19.)

24 Accordingly, the ALJ determined that plaintiff had not been disabled, as defined in the Act, from

25 plaintiff's SSI application date of February 3, 2009, through the date of the ALJ's decision.  (AT

26 27.)

27 ////

28 ////

4

1    B.    Plaintiff's Substantive Challenges to the Commissioner's Determinations

2          1.    Whether the ALJ erroneously found that plaintiff's impairments did not

3                meet Listings 104.02C and 100.02B

4    The claimant "bears the burden of proving that ... she has an impairment that meets or

5    equals the criteria of an impairment listed in Appendix 1 of the Commissioner's regulations."

6    Burch v. Barnhart, 400 F.3d 676, 683 (9th Cir. 2005).  "For a claimant to show that his

7    impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment

8    that manifests only some of those criteria, no matter how severely, does not qualify....For a

9    claimant to qualify for benefits by showing that his unlisted impairment, or combination of

10   impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in

11   severity to *all* the criteria for the one most similar listed impairment."  Sullivan v. Zebley, 493

12   U.S. 521, 530-31 (1990).  A determination of medical equivalence must rest on objective medical

13   evidence.  See Lewis v. Apfel, 236 F.3d 503, 514 (9th Cir. 2001) ("A finding of equivalence must

14   be based on medical evidence only."); Tackett v. Apfel, 180 F.3d 1094, 1100 (9th Cir. 1999)

15   ("Medical equivalence must be based on medical findings....A generalized assertion of functional

16   problems is not enough to establish disability at step three."); 20 C.F.R. § 404.1529(d)(3) ("In

17   considering whether your symptoms, signs, and laboratory findings are medically equal to the

18   symptoms, signs, and laboratory findings of a listed impairment, we will look to see whether your

19   symptoms, signs, and laboratory findings are at least equal in severity to the listed criteria.

20   However, we will not substitute your allegations of pain or other symptoms for a missing or

21   deficient sign or laboratory finding to raise the severity of your impairment(s) to that of a listed

22   impairment.").  Furthermore, "[t]he mere diagnosis of an impairment listed in Appendix 1 is not

23   sufficient to sustain a finding of disability."  Key v. Heckler, 754 F.2d 1545, 1549 (9th Cir. 1985).

24   Instead, all of the specified medical criteria must be met or equaled.  Id. at 1550.

25   In this case, plaintiff argues that she should have been found to meet Listings 104.02C and

26   100.02B.  Each listing is addressed separately below.

27   ////

28   ////

1

*Listing 104.02C*

2       Listing 104.02C requires "[c]hronic heart failure while on a regimen of prescribed

3 treatment, with symptoms and signs described in 104.00C2, and with one of the following:…C.2.

4 An involuntary weight loss or failure to gain weight at an appropriate rate for age, resulting in a

5 fall to below the third percentile from an established growth curve (on current NCHS/CDC

6 growth chart) which is currently present (see 104.00A3f) and has persisted for 2 months or

7 longer." 20 C.F.R. Pt. 404, Subp. P, App. 1, § 104.02C2.  In turn, the applicable symptoms and

8 signs described in 104.00C2 must include the presence of cardiomegaly or ventricular

9 dysfunction as demonstrated by appropriate imaging studies, as well as potential symptoms,

10 documented in the claimant's medical history and physical examinations, such as:

11
12
13
14
15
16
17
18
19

> easy fatigue, weakness, shortness of breath (dyspnea), cough, or chest discomfort at rest or with activity.  Children with CHF may also experience shortness of breath on lying flat (orthopnea) or episodes of shortness of breath that wake them from sleep (paroxysmal nocturnal dyspnea).  They may also experience cardiac arrhythmias resulting in palpitations, lightheadedness, or fainting. Fatigue or exercise intolerance in an infant may be manifested by prolonged feeding time, often associated with excessive respiratory effort and sweating…During infancy, other manifestations of chronic heart failure may include failure to gain weight or involuntary loss of weight and repeated lower respiratory tract infections…Signs of congestion may include hepatomegaly, ascites, increased jugular venous distention or pressure, rales, peripheral edema, rapid shallow breathing (tachypnea), or rapid weight gain. However, these signs need not be found on all examinations because fluid retention may be controlled by prescribed treatment.

20 20 C.F.R. Pt. 404, Subp. P, App. 1, § 104.00C2.

21       The ALJ found that plaintiff's "impairments, considered singly and in combination do not

22 meet or medically equal the criteria of any medical listing.  No treating or examining physician

23 has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the

24 evidence show medical findings that are the same or equivalent to those of any listed

25 impairment." (AT 18.)  More specifically, in concluding that plaintiff did not meet Listing

26 104.02C, the ALJ reasoned that "the criteria of Listing 104.02(C) are not met since the claimant is

27 not on a regimen of treatment for chronic heart failure and does not meet any of the requirements

28 of 104.00(C)."  (Id.)  These findings are supported by substantial evidence in the record as a

6

1 whole.

2       The record shows that plaintiff was diagnosed prior to birth with fetal congenital heart

3 disease. (AT 133.) Plaintiff was ultimately born, and received her initial medical care, at Lucile

4 Packard Children's Hospital in Palo Alto, California, which is affiliated with Stanford University.

5 An echocardiogram performed on plaintiff's birth date in October 2008 confirmed the presence of

6 right ventricular hypertension, a small patent ductus arteriosus, moderate tricuspid regurgitation, a

7 mildly dilated right atrium, moderate right ventricular hypertrophy, and a mildly dilated right

8 ventricle. (AT 134, 159-61.) A chest x-ray performed that same day showed moderate

9 cardiomegaly and mild pulmonary edema. (AT 152.) Plaintiff also experienced weight gain

10 issues and feeding difficulties in the hospital until November 10, 2008. (AT 134.) However,

11 despite these findings, plaintiff was largely asymptomatic, active, and vigorous. (AT 126.)

12       Moreover, the record indicates that plaintiff's heart and other conditions improved during

13 her hospital stay. EKG studies performed on October 31, 2008, and November 1, 2008, were

14 normal. (AT 134, 162-63.) A follow-up echocardiogram performed on November 3, 2008,

15 showed "significant improvement of the right ventricular pressures and hypertrophy." (AT 126,

16 156-58.) At the time of plaintiff's discharge from hospital on November 14, 2008, plaintiff had

17 clear breathing sounds without any distress, normal heart rhythm and no murmurs, and was alert

18 and active, sucking vigorously on her pacifier. (AT 135.) Medical staff noted that plaintiff's

19 weight gain and feeding difficulties had resolved, and that she had been gaining good weight in

20 the previous four days. (AT 134.)

21       At a subsequent November 18, 2008 examination by Stanford pediatric cardiologists Drs.

22 Seth Hollander and Rajesh Punn, plaintiff's parents reported one episode of sweating that did not

23 occur with feeding, but denied sweating with feeds, cyanotic episodes, or feeding difficulties.

24 (AT 127.) Plaintiff was noted to be feeding well and gaining weight since her discharge from the

25 hospital. (Id.) Drs. Hollander and Punn found plaintiff to have a regular heart rate and rhythm

26 with no murmurs, rubs, or gallops; clear lungs; and no signs of cyanosis. (Id.) An

27 echocardiogram performed that day showed normal ventricular proportions, mild right ventricular

28 hypertrophy, improved mild triscuspid regurgitation, and no evidence of patent ductus arteriosus

which had been present earlier.  (AT 127, 129-31.)  Drs. Hollander and Punn indicated that although plaintiff's right ventricular pressures were still above normal limits, the serial echocardiograms showed that they were normalizing.  (AT 127.)  They recommended a follow-up echocardiogram in about 3 months and anticipated continued resolution of plaintiff's heart condition, imposed no restrictions on her activities, and opined that she could receive routine pediatric care with special attention paid to weight gain and feeding habits.  (Id.)  Plaintiff's parents were instructed to watch for further episodes of sweating, respiratory distress while eating, pallor, or cyanosis.  (Id.)

Thereafter, plaintiff was seen at Shasta Community Health Center in Redding, California, mostly for regular weight checks and well-child visits.  On November 25, 2008, Dr. Palomero noted that plaintiff was well nourished, well developed, and gaining weight appropriately, with normal respiratory effort, clear lungs, regular heart rate and rhythm, and no murmurs.  (AT 189.)  On December 18, 2008, Dr. Terrazas likewise found plaintiff well-nourished and well developed, stating that she was gaining weight adequately.  (AT 187.)  Upon examination, plaintiff had a regular heart rate and rhythm, no murmurs, normal respiratory effort and clear lungs, and was alert with normal interaction.  (Id.)  At her two-month visit with Dr. Rhett Grover, plaintiff's parents stated that plaintiff was eating well and gaining weight, and reported no episodes of grunting with feedings or cyanosis.  (AT 185.)  Dr. Grover again found plaintiff to be well nourished and well developed with normal respiratory effort, clear lungs, regular heart rate and rhythm, and no murmurs.  (Id.)  No medications were prescribed, other than immunizations, which plaintiff's parents declined.  (Id.)

At a subsequent September 4, 2009 visit to Dr. Collin Lynn at Shasta Community Health Center, plaintiff's father stated that plaintiff was sweating while feeding and sleeping.  (AT 183.)  Upon examination, Dr. Lynn found plaintiff to be well nourished and well developed with normal respiratory effort, clear lungs, regular heart rate and rhythm, and no murmurs, but he noted an accentuated S1 heart sound.  (AT 183-84.)  Plaintiff had normal muscle tone without atrophy and was alert with normal interaction.  (AT 184.)  Plaintiff's parents indicated that they would follow up with a pediatric cardiologist the next month.  (Id.)  Dr. Lynn next saw plaintiff on April 22,

1  2010, for an 18-month well-child check, and observed that plaintiff had met all of her

2  developmental milestones.  (AT 207.)  Plaintiff's parents did not report any activity or exercise

3  concerns.  (Id.)  Dr. Lynn stated that plaintiff was well nourished and well developed with normal

4  respiratory effort, clear lungs, regular heart rate and rhythm, no murmurs, no cyanosis or edema,

5  normal muscle tone without atrophy, and appeared alert with normal interaction.  (AT 207-08.)

6  Thereafter, on June 2, 2010, plaintiff's parents reported that plaintiff was generally doing well

7  and tolerating foods well.  (AT 205.)  Dr. Lynn found plaintiff to be a "very active, alert child"

8  and noted her to be well nourished, well developed, and "gaining weight nicely."  (Id.)  He

9  instructed plaintiff's parents to follow up if they had any other concerns.  (Id.)

10         Subsequently, on November 18, 2010, plaintiff was examined by Stanford pediatric

11  cardiologist, Dr. Christina Miyake.  (AT 215-17.)  Dr. Miyake observed that since plaintiff was

12  last seen at Stanford, she was doing "very well."  (AT 215.)  Plaintiff's mother denied any chest

13  pain, palpitations, near syncope, syncope, or seizures, and reported no hospitalizations or

14  surgeries.  (Id.)  Even though plaintiff was small for her age, she was awake, playful, talkative,

15  and growing consistently, with a good appetite and lots of energy.  (Id.)  Plaintiff was not on any

16  medications.  (Id.)  Upon physical examination, plaintiff had clear lungs, and although Dr.

17  Miyake detected a low-pitched, short, systolic murmur, plaintiff otherwise had a regular heart rate

18  and rhythm with normal heart sounds.  (Id.)  An echocardiogram performed that day revealed a

19  normal biventricular heart with intact biventricular function, no pericardial effusion, and no

20  evidence of a persistent ductus arteriosus.  (AT 216, 218-19.)  The study did show mild tricuspid

21  regurgitation and mild prolapse of the tricuspid valve, but Dr. Miyake opined that that finding

22  was usually of no clinical significance.  (Id.)  Plaintiff's right ventricular hypertension was also

23  noted to have resolved over time.  (AT 216.)  Dr. Miyake recommended that plaintiff follow up

24  with pediatric cardiology in 3-5 years and stated that plaintiff did not require any medications or

25  special restrictions to her activities.  (Id.)

26         On February 18, 2011, plaintiff was seen for the first time by Dr. Jill McClure at Shasta

27  Community Health Center for her 2-year check.  (AT 278.)  Dr. McClure noted that she did not

28  have access to plaintiff's records from Stanford, but plaintiff's mother informed Dr. McClure that

1   the Stanford doctors had told plaintiff's mother that plaintiff "had a problem that persisted with

2   her heart," that she wanted plaintiff to see a local pediatric cardiologist, and that she wanted

3   documentation of plaintiff's height and weight for plaintiff's social security case.  (Id.)  Plaintiff's

4   mother further stated that plaintiff was sweating when sleeping and eating.  (Id.)  Upon physical

5   examination, Dr. McClure found plaintiff to be very active, running around the room, and

6   talkative.  (Id.)  She had normal respiratory effort, clear lungs, regular heart rate and rhythm, no

7   murmurs, and no edema.  (Id.)  Dr. McClure did note that plaintiff was below the 3rd percentile

8   for height and weight.  (AT 279.)  This finding was confirmed in a March 28, 2011 letter and in

9   growth charts that Dr. McClure submitted to the ALJ on April 14, 2011.  (AT 277, 284-93.)

10          As is evident from the above record evidence, although plaintiff certainly suffered from

11   serious heart impairments around the time of her birth, there are no medical findings indicating

12   that plaintiff suffered from chronic heart failure between February 3, 2009, the date that

13   plaintiff's SSI application was filed,[4] and June 20, 2011, the date of the ALJ's decision.  No

14   imaging studies during the relevant period have shown the presence of cardiomegaly or

15   ventricular dysfunction, nor have there been any other significant medical findings of heart

16   disease.  Furthermore, plaintiff has not been on a regimen of prescribed treatment for chronic

17   heart failure during the relevant period.  Plaintiff was not prescribed any medications for heart

18   conditions, nor was she put on any special restrictions by her treating specialist pediatric

19   cardiologists, who instead opined that plaintiff's heart impairments had generally resolved.

20   Additionally, the medical records from plaintiff's general pediatricians show that, although small

21   for her age, plaintiff was generally well-nourished, active, and reaching all appropriate

22   developmental milestones.

23          To be sure, plaintiff may meet *some* of the criteria of Listing 104.02C—plaintiff's height

24   and weight were below the 3rd percentile for at least two months during the relevant period, and

25   the record documents subjective reports of at least a few of the symptoms outlined in section

26   104.00C2, such as sweating with feeding.  However, for the reasons discussed above, plaintiff

27   _____

28   [4] Regardless of the alleged disability onset date, SSI is not payable prior to the month following
     the month in which the application was filed.  20 C.F.R. § 416.335.

1   does not meet all of the required criteria of that Listing, including the crucial requirement of

2   chronic heart failure while on a regimen of prescribed treatment.  The evidence also does not

3   plausibly suggest that plaintiff has medical findings equal in severity to all of the required criteria

4   of Listing 104.02C.

5       Accordingly, the ALJ appropriately determined that plaintiff did not meet or medically

6   equal Listing 104.02C.

7                   *Listing 100.02B*

8       The ALJ did not consider whether plaintiff meets or equals Listing 100.02B.  However,

9   after reviewing the record as a whole, the court finds that any such error was harmless.  See Curry

10  v. Sullivan, 925 F.2d 1127, 1129 (9th Cir. 1990) (harmless error analysis applicable in judicial

11  review of social security cases).

12      Listing 100.02B requires a "[g]rowth impairment, considered to be related to an additional

13  specific medically determinable impairment, and one of the following:…B. Fall to, or persistence

14  of, height below the third percentile."  20 C.F.R. Pt. 404, Subp. P, App. 1, § 100.02B.

15      The parties devote significant discussion to whether plaintiff has satisfied the durational

16  requirement of that listing, which is twelve (12) months.  See 20 C.F.R. § 416.925(c)(4) ("For

17  some listings, we state a specific period of time for which your impairment(s) will meet the

18  listing.  For all others, the evidence must show that your impairment(s) has lasted or can be

19  expected to last for a continuous period of at least 12 months.").  However, even assuming that

20  the durational requirement was satisfied as to plaintiff's height, the record evidence does not

21  show that plaintiff's height percentile was *related to an additional specific medically*

22  *determinable impairment*.  As outlined above, there are no medical findings or opinions showing

23  that, during the relevant period, plaintiff suffered from a specific and clinically significant heart

24  impairment or other impairment that impeded plaintiff's growth.  Plaintiff's treating specialist

25  pediatric cardiologist, Dr. Miyake, on November 18, 2010, indicated that although plaintiff was

26  small for her age, she was growing consistently, and Dr. Miyake prescribed no medications and

27  imposed no activity restrictions.  (AT 215-16.)  Indeed, the overwhelming majority of plaintiff's

28  treating providers did not document any significant concerns regarding plaintiff's long-term

growth, nor did they recommend any specific treatment.  There is no record that even Dr.

McClure (who expressed some concern regarding plaintiff's growth, but did not at the time have

access to plaintiff's relatively benign records from her heart specialists) pursued any specific

treatments related to plaintiff's growth.  In light of this record, plaintiff has not met her burden of

showing that she meets or medically equals Listing 100.02B.

Notably, Listing 100.03 specifically provides for growth impairments that are "not

identified as being related to an additional, specific medically determinable impairment."  20

C.F.R. Pt. 404, Subp. P, App. 1, § 100.03.  However, Listing 100.03 requires different and more

severe findings than Listing 100.02, and plaintiff has not argued that she meets or medically

equals Listing 100.03, nor does the record appear to contain any evidence that would support such

a finding.

In sum, substantial evidence in the record as whole supports the ALJ's determination that

plaintiff did not meet or medically equal a listing.[5]  Although the court is sympathetic to the fact

that plaintiff had suffered from serious heart impairments around the time of her birth, the record

evidence plainly does not show that plaintiff met or medically equaled all of the requirements of

Listings 104.02C and 100.02B during the period relevant to plaintiff's present application.

2.    Whether the ALJ failed to appropriately develop the record

"The ALJ always has a 'special duty to fully and fairly develop the record and to assure

that the claimant's interests are considered ... even when the claimant is represented by counsel.'"

Celaya v. Halter, 332 F.3d 1177, 1183 (9th Cir. 2003) (citing Brown v. Heckler, 713 F.2d 441,

443 (9th Cir. 1983)).  "When the claimant is unrepresented, . . . the ALJ must be especially

diligent in exploring for all the relevant facts."  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th

Cir. 2001).

Plaintiff contends that the ALJ failed to properly develop the record, because he did not

obtain an updated expert medical opinion on whether plaintiff met Listings 104.02C and 100.02B.

More specifically, plaintiff argues that the ALJ impermissibly relied on the opinions of the state

---

[5] As noted above, the ALJ also determined that plaintiff did not functionally equal a listing.
Plaintiff has not challenged the ALJ's findings concerning functional equivalence in this appeal.

1   agency physicians, who on May 11, 2009, and February 11, 2010, found that plaintiff did not

2   meet, medically equal, or functionally equal a listing.  (AT 169-77, 193-99.)  Plaintiff points out

3   that these doctors did not have access to crucial medical records, such as the height and weight

4   charts submitted by Dr. McClure long after the state agency physicians had rendered their

5   opinions, and that updated opinions were therefore required.  However, regardless of any findings

6   concerning plaintiff's height or weight, the record evidence unambiguously indicates that plaintiff

7   failed to meet or equal several other important criteria in Listings 104.02C and 100.02B.  Thus,

8   an updated opinion incorporating the height and weight charts would not be of consequence to the

9   final non-disability determination.

10          Plaintiff also argues that the ALJ failed to secure a meaningful waiver of plaintiff's

11   mother's right to representation at the administrative hearing, because plaintiff's mother was

12   distracted by having to mind two children at the hearing.  That argument borders on the frivolous.

13   The hearing transcript shows that the ALJ carefully explained plaintiff's right to counsel and

14   offered a postponement of the hearing to obtain counsel, to which plaintiff's mother responded:

15   "We'll just go ahead."  (AT 36-37.)  Although plaintiff's mother was at times sidetracked by

16   having to speak to her children during the hearing, she ultimately answered the ALJ's questions,

17   who appeared to make best efforts to accommodate the situation.  Furthermore, plaintiff's mother

18   was previously advised in writing of her rights to obtain counsel in the Notice of Hearing issued

19   prior to the administrative hearing.  (AT 66-74.)  Moreover, plaintiff does not articulate any

20   specific prejudice that she suffered as a result of proceeding without counsel.

21   V.      CONCLUSION

22          For the foregoing reasons, the court finds that the ALJ's decision was free from

23   prejudicial error and supported by substantial evidence in the record as a whole.  Accordingly, IT

24   IS HEREBY ORDERED that:

25          1.  Plaintiff's motion for summary judgment (ECF No. 15) is DENIED.

26          2.  The Commissioner's cross-motion for summary judgment (ECF No. 16) is

27   GRANTED.

28          3.  Judgment is entered for the Commissioner.

1      4. The Clerk of Court is directed to close this case and vacate all dates.

2      IT IS SO ORDERED.

3   Dated:  November 19, 2013

4

5                                                      _____
                                                       KENDALL J. NEWMAN
6                                                      UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14